A07A1751. SMITH et al. v. STEWART.
(660 SE2d 822)

ELLINGTON, Judge.

In this appeal, Haywood Smith, author of a book entitled *The Red Hat Club*, and St. Martin's Press, LLC, publisher of the book,appeal from the trial court's denial of summary judgment in a defamation suit brought by Vickie Stewart.[1] Also appealing from thecourt's ruling are the following named defendants, each of whom published the book in different formats after the initial publication by St. Martin's Press: Holtzbrinck Publishers, LLC; Chivers North America, Inc.; Audible, Inc.; and Center Point, Inc. (collectively, the

---

[7] Id. (citation omitted).

[1.] This Court granted the defendants' application for interlocutory review of the denial of summary judgment.

"secondary publishers"). In addition to defamation, Stewart asserted claims for false light invasion of privacy, negligent infliction of emotional distress, intentional infliction of emotional distress, and public disclosure of private facts. The defendants contend that the court erred in finding that a jury issue existed regarding the elements of the defamation claim, in holding that Stewart was not required to plead and prove special damages in her defamation suit, and in denying summary judgment on Stewart's other claims. For the following reasons, we affirm the court's denial of summary judgment to Smith and St. Martin's Press on Stewart's claims for defamation per se and public disclosure of private facts, but we reverse the denial of summary judgment to the secondary publishers on those claims and to all of the defendants on the remaining claims. We remand this case to the trial court with direction to enter judgment accordingly.

> In order to prevail on a motion for summary judgment under OCGA § 9-11-56, the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citations and punctuation omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

Viewed in the light most favorable to Stewart, as the nonmovant, the record shows the following relevant facts. Vickie Stewart is a 60-year-old woman who grew up in the Buckhead area of Atlanta and graduated from Northside High School. She met Anne Haywood Pritchett (now known as "Haywood Smith") as a child when she moved to Cottage Lane, just down the street from Smith. As an adult, Stewart got married and had two children, including a daughter she named "Mindunn." Stewart's first husband was killed in a car accident, and she received a substantial insurance settlement. She subsequently became engaged to Harold Stewart ("Harold"); at the time, she did not know that Harold was also engaged to another woman. Harold owned several nursing homes in Florida. In 1983, Stewart married Harold, but they divorced after

Harold moved to Florida, stole her insurance money, and transferred his assets to his mistress. A Fulton County judge awarded Stewart $750,000 in the divorce, but Stewart was unable to collect on the award. She placed advertisements in a Florida newspaper offering a reward to anyone who provided information about when Harold was in Georgia so he could be held in contempt of the court's order. Then, in 1998, when Stewart was over 50 years old, she became a flight attendant.

Haywood Smith is an author who has known Stewart for over 50 years. Smith was familiar with Stewart's background, and Stewart had talked to Smith about her (Stewart's) first marriage, her relationship with Harold, the circumstances of their divorce, and Stewart's efforts to collect the court's $750,000 award. Smith believed that Stewart's stories were "really good" and decided to include them in a book she was writing. In 2002, Smith wrote a novel about five middle-aged women who lived in Buckhead, were life-long friends, and were members of a group called the "Red Hat Club." One of the women was "Susan Virginia McIntyre Harris Cates" and was nicknamed "SuSu." According to the book, SuSu moved to Cottage Circle in Atlanta, near the book's narrator, and attended Northside High School. SuSu got married and had two children, including a daughter named "Mignon." SuSu's first husband was killed in a car accident, and she received a large insurance settlement. SuSu became engaged to a man who owned nursing homes in Florida and was already secretly engaged to another woman. He eventually stole all of SuSu's money from the insurance settlement, moved to Florida, and transferred all of his assets to a "bimbo" with whom he was having an affair. A Georgia court subsequently awarded SuSu $750,000, but she was unable to collect the money because the man "skipped out to Florida." SuSu became obsessed with collecting the money and eventually placed an advertisement in a newspaper and created "Wanted" posters offering a reward to anyone who could lure the man back into Georgia. SuSu later became a flight attendant, and her friends jokingly referred to her as the "world's oldest stewardess."

The book also portrayed SuSu as an unrehabilitated alcoholic who secretly drank alcohol before and during flights and frequently became intoxicated — even "smashed" — in public. SuSu was very promiscuous, regularly engaging in one-night stands with passengers she met on flights, affairs with married men, and casual sex with young "stud puppies." In the book, when SuSu talked about having a "layover," it "was a double entendre of galactic proportions." SuSu had a "stubbornly disastrous taste in men," and she was prone to wearing provocative clothing and engaging in lewd behavior in public. The book also described SuSu as foul-mouthed,

insensitive and ill-mannered, a "right-wing reactionary" and atheist, and a "loose cannon" with a bad temper.

In addition to extensively describing SuSu's background and her present lifestyle, the book also chronicled the lives of the other four women and included story lines about adultery, spousal abuse, wayward children, social class prejudice, bank fraud, theft, deceit, and other adult themes. Among the many different story lines was a tale about how the women conducted surveillance on one of the club member's husbands, who was having an affair and was involved in bank fraud, and covertly accessed his e-mail account and personal documents, and how they eventually confronted him with proof of such malfeasance that he immediately agreed to a very favorable divorce settlement for his wife. Notably, this wayward husband was named "Harold," the same first name as that of Stewart's ex-husband.

St. Martin's Press published the hardcover edition of Smith's book in 2003, and it reached number 15 on the *New York Times* bestseller list. The secondary publishers published the book in other formats, including as an audiobook, an internet download, and a large print version. Shortly after it was published, Stewart and several of her friends started reading the book and immediately concluded that Stewart shared so many unique, similar characteristics with SuSu that SuSu must have been based on Stewart.[2] According to Stewart, she was very upset, hurt, and shocked by what she read in the book, was dismayed because this "came out of the blue" and no one had warned her that Smith was going to write about her, and could not believe Smith "would do this" to her. Further, Stewart suffered public humiliation, ridicule and embarrassment when her friends gossiped about her and questioned whether Stewart was, in fact, the promiscuous alcoholic portrayed in the book. One friend even deposed that the book made Stewart look "awful," "like a tramp," and that she and her friends did not discuss the book around Stewart because they did not want to embarrass her.

Shortly after reading the book, Stewart e-mailed Smith and asked her how she kept from losing "life-long friends" and being sued for libel. Smith responded by e-mail that the book was a work of fiction and the characters were fictional. Smith soon learned that Stewart was threatening to sue her for libel. Smith informed her editor at St. Martin's Press that "an acquaintance" had threatened

---

[2] For example, one friend deposed that the resemblance was "uncanny," particularly the parts that were based upon Stewart's ex-husband. Another said that her friends passed the book around and "it was obvious to [them] that Vickie [Stewart] was SuSu," adding that SuSu was "Vickie to a T" and "couldn't have been anybody else."

to sue her for libel based on the book. The editor told Smith that she should not apologize to or initiate any more contact with Stewart about the book.

In August 2004, Stewart filed suit against Smith, St. Martin's Press, and the secondary publishers, asserting claims for defamation, invasion of privacy, and infliction of emotional distress. Stewart claimed that there were so many significant similarities between her life and that of SuSu that they would lead a "reasonable person who knows [her] and who reads the book to reasonably conclude that the character SuSu is Vickie Stewart." The complaint also charged that, as a result, Stewart is falsely depicted as an "alcoholic slut who drinks while working as a flight attendant" and that such depiction is defamatory per se.

After Stewart filed suit against the defendants, St. Martin's Press published a paperback edition of *The Red Hat Club*. At Smith's request, the publisher added a disclaimer to the paperback edition which stated that the book was a work of fiction. The rest of the book remained unchanged.

The defendants moved for summary judgment on all of Stewart's claims, contending that they were entitled to judgment as a matter of law because the book is a work of fiction. They also argued that Stewart could not establish the facts necessary to sustain her claims and that the novel could not reasonably be understood to be stating actual facts of and concerning Stewart. Stewart filed a cross-motion for partial summary judgment, and showed, in addition to the facts outlined above, that Smith admitted that Stewart had told her about the divorce and the surrounding events before she (Smith) wrote the book,[3] that Smith thought the stories were "really good" and that Stewart's actions had been "imaginative and gutsy," and that Smith decided to use the information in the book to "help create the character" of SuSu.[4] It is undisputed that Smith used Stewart's life, specifically her divorce and the surrounding events, as inspiration for the character of SuSu, although Smith also claimed that some of SuSu's characteristics were based on other people she had met, most of whom she could not identify.[5] Yet, even though

---

[3] In fact, Smith admitted that, before she wrote the book, she knew that Stewart's first husband had died in a car accident, Stewart's second husband had been engaged to another woman while engaged to Stewart, Stewart had been awarded $750,000 in the divorce from Harold Stewart, Harold had moved to Florida, he had had an affair and transferred his assets to his mistress, Stewart had placed a reward offer in a Florida newspaper, and Stewart had become a flight attendant after the age of 50.

[4] Smith claimed that Stewart gave her permission to write about these events, but Stewart denied the claim.

[5] Further, in the "Author's Note" at the beginning of the book, Smith wrote that the book was inspired by the poem "Warning" by Jenny Joseph and "the experiences of two brave

Smith admitted that she used specific details from Stewart's personal life as at least a partial basis for SuSu's character, Smith also admitted that she did not know anything about Stewart's drinking habits or sex life and that she had completely fabricated the stories about SuSu's alcoholism, drinking on the job, and promiscuous behavior.

After reading the book, reviewing the evidence, and conducting a hearing, the trial court denied the parties' motions for summary judgment. The court found that, despite the defendants' assertion that the book was a work of fiction, the many specific similarities between Stewart and the character SuSu, the numerous references to actual people and places, and the nature of the allegedly defamatory statements at issue created jury questions as to whether the book contained false and defamatory statements of and concerning Stewart and whether those statements could reasonably be understood to describe actual facts about her. Further, the court found that a jury issue existed as to whether St. Martin's Press and the secondary publishers were negligent in publishing a book that contained defamatory material. Finally, the court concluded that the plain meaning of the statements at issue, specifically those which depicted SuSu (and, by implication, Stewart) as a promiscuous alcoholic, were defamatory on their face, so that Stewart was not required to plead and prove special damages in order to maintain her suit.

1. On appeal, the defendants contend that Stewart failed to identify any evidence supporting the essential elements of her defamation claim and, therefore, the trial court erred in denying summary judgment on the claim. A cause of action for defamation consists of four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm."[6] (Punctuation and footnote omitted.) *Mathis v. Cannon*, 276 Ga. 16, 20-21 (2) (573 SE2d 376) (2002). See

---

and wonderful friends." Then, in the "Acknowledgments" section at the end of the book, Smith acknowledged the "real people whose stories provided a jumping-off point for my overactive imagination. You know who you are." Moreover, in a promotional interview about the book, Smith stated that SuSu was one of her favorite characters because SuSu had rejected her "fundamental roots" after her husband was killed in a car accident and that SuSu had "decided to get into meaningless sex with boy toys and alcohol and too many cigarettes," then added that SuSu was "based on, loosely based on, someone I know." And in e-mails to fans following publication of the book, Smith referred to her "ex-friend" whose life was the inspiration for her "fictional slut, SuSu."

[6] The defendants do not dispute that a jury issue exists as to whether the allegedly defamatory statements describing SuSu's alcoholism and promiscuity are false to the extent that the statements apply to Stewart. Further, it is undisputed that the defendants published

OCGA § 51-5-1 (a) ("A libel is a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule.").[7]

(a) Regarding the first element of a defamation claim, that is, whether the publication could be found to be "a false and defamatory statement concerning the plaintiff," "the allegedly defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff." (Citation and punctuation omitted.) *Fiske v. Stockton*, 171 Ga. App. 601, 602 (1) (320 SE2d 590) (1984). Stated differently, the plaintiff has the burden of showing, inter alia, that "the publication was about the plaintiff, that is, whether it was of and concerning her as a matter of identity." *Pring v. Penthouse Intl.*, 695 F2d 438, 439 (10th Cir. 1982). See *New York Times Co. v. Sullivan*, 376 U. S. 254, 267 (II), 288-289 (III) (84 SC 710, 11 LE2d 686) (1964) (discussing the "of and concerning" test for libel). The "of and concerning" test for works of fiction is essentially the same as that for nonfiction. "The test is whether persons who knew or knew of the plaintiff could reasonably have understood that the fictional character was a portrayal of the plaintiff." (Citations omitted.) *Allied Marketing Group v. Paramount Pictures Corp.*, 111 SW3d 168, 173, n. 3 (Tx. Ct. App. 2003). "It is not necessary that all the world should understand the libel; it is sufficient if those who knew the plaintiff can make out that [she] is the person meant." (Citations omitted.) *Fetler v. Houghton Mifflin Co.*, 364 F2d 650, 651 (2nd Cir. 1966). Consequently, the defendants are only entitled to summary judgment on this issue if, on the undisputed facts, no jury could reasonably conclude that the character of SuSu was a portrayal of Stewart. Id.

In this case, in addition to the numerous unique facts about Stewart which Smith used to create SuSu's character and background, as outlined above, the book includes many other references to distinct, albeit more common, similarities between Stewart and SuSu. These similarities include their propensity for being chronically late, their hair color (red/auburn), their chain-smoking and smoker's cough, and the descriptions of their parents' occupations and their childhood homes, as well as other facts about Stewart that were not matters of public knowledge until the publication of the

---

the statements at issue to third parties. The elements of negligence and damages are addressed in Divisions 2, 3 and 4, infra.

[7] Because Georgia law on defamation claims based upon fictional works is relatively undeveloped, the parties rely heavily on the laws of other states and the federal courts to support their arguments. On those issues that have not been fully addressed in Georgia, we also look to the laws of other states and the federal courts as persuasive authority.

book. See Division 5 (a) (i), infra. In fact, the trial court found at least twenty-six specific examples of similarities between the two. As noted above, these similarities led many readers to immediately conclude that SuSu was based on Stewart.

Further, the defendants have conceded that SuSu was inspired by and based in part on Stewart, that there are numerous similarities between Stewart and SuSu, and that SuSu is recognizable as Stewart. The defendants argue, however, that there are also many differences between Stewart and SuSu, such as their names and the names of their friends, and the fact that, unlike SuSu, Stewart was not a high school cheerleader or a member of a sorority and does not belong to a group called The Red Hat Club. Those differences, however, merely create a jury issue as to whether the character of SuSu was a portrayal of Stewart. *Fetler v. Houghton Mifflin Co.*, 364 F2d at 653-654.

Under these circumstances, Stewart should be allowed the opportunity to prove that, despite the fictional label, the character of SuSu bears such a close resemblance to Stewart that a jury could reasonably conclude that the character was intended to portray her. Whether the book was actually understood by third parties to be about Stewart is, of course, a question of fact for the jury. See *Fetler v. Houghton Mifflin Co.*, 364 F2d at 653-654; see also *New York Times Co. v. Sullivan*, 376 U. S. at 267 (II); *Bryson v. News America Publications*, 672 NE2d 1207, 1219 (I) (B) (3) (Ill. 1996).

Thus, the trial court properly denied summary judgment to the defendants on the issue of whether the character of SuSu was a portrayal of Stewart. See *Fetler v. Houghton Mifflin Co.*, 364 F2d at 651 (given the numerous specific similarities between the plaintiff and the "fictional" character in a novel, "it is difficult to see how a jury could be characterized as unreasonable if it found that [the character] could reasonably be understood as a portrayal of plaintiff"); see also *Davis v. Copelan*, 215 Ga. App. 754, 763-764 (1) (452 SE2d 194) (1994) (physical precedent only) (a jury issue existed as to whether an average reader would recognize the plaintiffs as people described in an article as criminals or suspected criminals).

(b) The defendants also contend that the court erred in finding that the allegedly defamatory excerpts from the book could reasonably be understood as stating actual facts about Stewart. They argue that the book is "clearly and unambiguously a work of fiction," that the book contains a disclaimer[8] opposite the dedication stating that

---

[8] The disclaimer reads as follows: "This novel is a work of fiction about a group of women who belong to a group like the Red Hat Society. It has not been authorized or endorsed by the Red Hat Society."

it is a work of fiction, and that the book is simply a "light-hearted romp that tells a thoroughly fantastic tale about five middle-aged women . . . undertaking an over-the-top scheme for revenge on a philandering husband."

> The test to be applied in determining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the court examine the statement in its totality in the context in which it was uttered or published. It is not unusual to protect false statements of fact where, because of the context, they would have been understood as part of a satire or fiction. Although the fictional or humorous nature of a publication will not necessarily insulate it from a libel claim, if the allegedly defamatory statement could not be reasonably understood as describing actual facts about the plaintiff or actual events in which he participated, the publication will not be libelous.

(Citations and punctuation omitted.) *Bollea v. World Championship Wrestling*, 271 Ga. App. 555, 558 (1) (610 SE2d 92) (2005).[9]

The defendants contend that certain passages[10] in the book are so "whimsically outlandish" and "implausible" that no reader could reasonably believe that "the novel is relating real-life events" about any real person, including Stewart. Pretermitting whether those specific passages, read in isolation, could be deemed implausible, those passages must be read in context with the entire book. The record shows that Smith based much of the book upon true stories, some of which actually involved Stewart, that she set the action in actual restaurants, hotels, clubs, and other buildings located in and around the city of Atlanta, and that she researched the details of the book to ensure their accuracy and to add "credibility" to the book. And the book is not just a "light-hearted romp" that simply describes a few "implausible" antics by the main characters; it also includes stories about real adult issues, including adultery, divorce, spousal abuse, mid-life crises, deceit, disappointment, and regret. In fact, in an e-mail message to a fan of the book, Smith admitted that

---

[9] See *Pring v. Penthouse Intl.*, 695 F2d at 442 (the question is "whether the charged portions in context could be reasonably understood as describing actual facts about the plaintiff or actual events in which she participated"); *Bryson v. News America Publications*, 672 NE2d at 1220 (I) (C) ("a statement is constitutionally protected under the first amendment only if it cannot be reasonably interpreted as stating actual facts") (citations and punctuation omitted).

[10] These passages describe how the Red Hat Club covertly conducted surveillance of a member's husband while he has sex with his mistress, accessed the man's e-mail accounts, and confronted the man with evidence of his infidelity and bank fraud, as well as how one club member amassed a small fortune by saving, then investing, money over several years.

her "books deal realistically with sexuality, anger, and women in crisis who make destructive choices."

Throughout the book, Smith portrays SuSu as a middle-aged flight attendant who is an alcoholic and drinks on the job, and who regularly engages in lewd public behavior, one night stands, secret affairs with married men, and brief sexual relationships with younger men. This negative depiction is commingled with specific references to SuSu's background, references which Smith admits were drawn directly from Stewart's life. Considering the allegedly defamatory assertions in context with the rest of the book, we cannot say that the assertions are so implausible, fanciful or ridiculous that no one could reasonably interpret them as stating actual facts. Instead, they are sufficiently plausible and factual that they could be proven true or false. Whether they are *actually* true or false is a question for the jury. See *Bryson v. News America Publications*, 672 NE2d at 1220 (I) (C).

Further, to the extent that the defendants argue that merely because a book is labeled as "fiction" or a "novel" it is automatically protected from being considered defamatory, such argument lacks merit. Simply because a book is labeled "fiction" does not mean that it may not be defamatory. See *Muzikowski v. Paramount Pictures Corp.*, 322 F3d 918, 925 (III) (A) (7th Cir. 2003). In other words, the test for libel "is not whether the story is or is not characterized as 'fiction,' or 'humor,' but whether the charged portions, in context, could be reasonably understood as describing actual facts about the plaintiff or actual events in which she participated." (Citation omitted.) *Bryson v. News America Publications*, 672 NE2d at 1220 (I) (C). Further, when an author uses the real names of people and places in order to give the book a sense of historical accuracy, simply labeling the book "a novel" or "a work of fiction" will not prevent its readers from reasonably believing the book is something other than a purely fictional work. See *Marcinkus v. NAL Publishing*, 522 NYS2d 1009, 1013 (4) (N.Y. 1987).

Accordingly, because the allegedly defamatory portions of the book could be reasonably understood as describing actual facts about Stewart or actual events in which she participated, the defendants were not entitled to summary judgment on this issue. See *Bryson v. News America Publications*, 672 NE2d at 1220 (I) (C) (a statement that described a woman as a "slut" had the clear impact of stating that the woman was sexually promiscuous and was a "provably false factual assertion"); cf. *Bollea v. World Championship Wrestling*, 271 Ga. App. at 558 (1) (statements made about a fictional character, Hulk Hogan, could not be reasonably understood to describe actual facts about the actor/wrestler who portrayed Hogan, Terry Bollea).

2. The defendants argue that the trial court should have granted their motion for summary judgment on Stewart's defamation claim because Stewart did not plead and present evidence of special damages in support of the claim. In her complaint, Stewart claims that the allegedly defamatory passages of the book depict her as an "alcoholic slut who drinks while working as a flight attendant" and that the passages are so degrading that they are defamatory per se.

> A written defamatory statement is actionable as either libel per se or libel per quod. Libel per se consists of a charge that one is guilty of a crime, dishonesty[,] or immorality. . . . Defamatory words which are actionable per se are those which are recognized as injurious on their face — without the aid of extrinsic proof. [In contrast], if the defamatory character of the words does not appear on their face but only become defamatory by the aid of extrinsic facts, they are not defamatory per se, but per quod, and are said to require innuendo.

(Citations and punctuation omitted.) *Zarach v. Atlanta Claims Assn.*, 231 Ga. App. 685, 688 (2) (500 SE2d 1) (1998). Unlike in an action for libel per quod, in an action for libel per se, "special damages need not be proved because damage is inferred." *Belle-meade, LLC v. Stoker*, 280 Ga. 635, 637 (631 SE2d 693) (2006), citing OCGA § 51-5-4 (b).

(a) The defendants contend that, no matter how unflatteringly SuSu is depicted in the book, the passages are not injurious on their face to anyone, including Stewart, because the book is clearly "harmless fiction" and only describes fictional characters and events. Given our ruling in Division 1, supra, this argument lacks merit.

(b) Thus, the issue is whether the challenged passages portraying SuSu (and, therefore, Stewart) as a promiscuous alcoholic are injurious on their face and, therefore, defamatory per se. According to the book, SuSu is an alcoholic with a long history of alcohol abuse, who secretly drinks before and during flights while working as a flight attendant, and who frequently becomes "smashed" in public.[11] Further, the book portrays SuSu as extremely promiscuous, docu-

---

[11] For example, the book describes the narrator's concern about SuSu's alcoholism and denial, stating that SuSu

confessed – with an edgy laugh that dismissed the serious implications – to drinking before and after the shorter [flights] and sneaking a few discreet snorts during the longer ones. Everything in me had wanted to fix her, to shake her until she admitted she had a problem, to drag her to a twelve-step program, or arrange an intervention or do *something* before she lost her job and her self-respect.

menting SuSu's frequent one night stands, secret affairs with married men, brief sexual relationships with younger men,[12] and lewd, outrageous public sexual behavior.[13]

After reviewing these allegedly defamatory passages in context and considering their natural and obvious meanings, we conclude that no extrinsic evidence is required to demonstrate that they are injurious on their face. See *Howard v. Town of Jonesville*, 935 FSupp. 855, 861 (W.D. La. 1996) (stating that a woman is "sleeping with everyone" at her place of employment and is incapable of performing her job duties "would appear to be defamatory on its face") (punctuation and footnote omitted); *Smith v. Atkins*, 622 S2d 795, 800 (La. Ct. App. 1993) (calling a woman a "slut" is defamatory per se); see also *Bryson v. News America Publications*, 672 NE2d at 1217 (I) (B) (2) (after considering the author's use of the word "slut" in context, and considering its natural and obvious meaning, it was evident that the author intended the word "slut" to describe the plaintiff's sexual proclivities); cf. *Bellemeade, LLC v. Stoker*, 280 Ga. at 636, 639 (defendant's statement that the plaintiff was not going to sell property much longer was not slander per se because it was not recognizable as injurious on its face and, absent extraneous facts showing the defamatory character of the words, did not cast aspersions on the plaintiff's profession or reputation).

Consequently, we agree with the trial court that the passages are defamatory per se and that Stewart is not required to plead and prove special damages in support of her defamation claim. See *Zarach v. Atlanta Claims Assn.*, 231 Ga. App. at 688-689 (2). The court properly refused to dismiss her claim or grant summary judgment to the defendants on this basis.

3. The defendants contend that the court erred in denying the motion for summary judgment by St. Martin's Press because Stewart failed to present any evidence of its negligence.[14] Because Stewart is a private individual and not a public figure, an ordinary negligence

---

[12] For example, when describing one of SuSu's young "stud puppies," the book states that he had a "marijuana-mellow expression." SuSu then tells her friends that he is a genius "in the sack." The narrator laments that she made no effort to remember his name, because "[n]one of [SuSu's] stud puppies lasted past the discovery that her obsession with getting that $750,000 settlement . . . was hopeless." Later in the book, when SuSu was at a party with a different man, she admitted that she "practically raped that stud puppy standing up."

[13] The book describes SuSu as being "on the hunt," a sexual "genius," and "totally degenerate," and refers to her wild, lewd dancing and public displays of inappropriate sexual behavior.

[14] In a supplemental brief, Stewart argues that the defendants were not entitled to summary judgment because they had destroyed evidence showing their fault and, therefore, she was entitled to a rebuttable presumption that the evidence would have been favorable to her. Although Stewart filed a motion in the trial court to strike the defendants' answer due to the alleged spoliation of evidence, the court never ruled upon the motion or made a ruling

standard applies, meaning that she must show that each of the defendant publishers failed to exercise ordinary care when they published the book. *Mathis v. Cannon*, 276 Ga. at 21 (2); *Triangle Publications v. Chumley*, 253 Ga. 179, 181 (1) (317 SE2d 534) (1984). Whether a publisher was negligent is generally an issue for the jury. *Diamond v. American Family Corp.*, 186 Ga. App. 681, 683 (1) (368 SE2d 350) (1988).

In this case, the evidence showed that in a preliminary draft of the book, Smith had included an acknowledgment to "my precious friends, Vickie S. [and two others] for the inspiration their lives provided for this fictional story." It is undisputed that "Vickie S." refers to Stewart. Smith's editor at St. Martin's Press admitted that she did not review Smith's author's notes or acknowledgments until after the book was published and Stewart had filed her lawsuit. By that time, Smith had deleted her acknowledgment of "Vickie S."

The editor also admitted that St. Martin's Press has no policies or procedures to protect the reputation of individuals who may be identified in published works. According to the editor, she has never asked an author if his or her novel was based in whole or in part upon real life events, even when an author acknowledges that a real person was the model for a character in a book, because she has "no responsibility" for that since the novels are "made up." The editor specifically deposed that she never asked Smith if the book was in part autobiographical, if the book was based upon real people or real events, or if Smith used the real names of actual people, even though she knew that the book was based on Smith's memories of growing up in Atlanta. She also stated that, because the book was a novel, she did not have the publisher's legal department do a "libel check" of Smith's manuscript before publication.

As shown above, after reading the book in December 2003, Stewart contacted Smith by e-mail about her (Stewart's) belief that she had been libeled. Smith informed her editor at St. Martin's Press that "an acquaintance" had contacted her by e-mail, that the woman believed SuSu was based on her, and that the woman had threatened to sue her for libel. The editor told Smith that she should not apologize to or initiate any more contact with Stewart about the book.

Then, in January 2004, before the lawsuit was filed, Smith requested that St. Martin's Press include a new disclaimer in the paperback version because a friend was "upset" and Smith wanted to be sure that people understood that the book was a novel. The

regarding the alleged spoliation. Therefore, until spoliation by the defendants is established, no presumption arises.

editor, however, did not remember if she ever asked Smith why the person was upset or why she (Smith) wanted the disclaimer.

Stewart filed her defamation lawsuit in August 2004. Less than two months later, St. Martin's Press published the paperback version of the book.

Based upon the evidence, we agree with the trial court that a jury issue exists as to whether St. Martin's Press exercised ordinary care by undertaking reasonable steps to protect a private person from defamatory statements. See *Mathis v. Cannon*, 276 Ga. at 21 (2); *Triangle Publications v. Chumley*, 253 Ga. at 180 (1).[15]

4. The defendants also argue that Stewart failed to present any evidence in the court below of negligence by the secondary publishers. The record shows that none of the secondary publishers had any actual knowledge about Stewart or her claims regarding the book prior to the publication of the audiotaped, internet, and large-type versions of the book. Further, Stewart's appellate brief does not cite to any evidence of any culpable acts by the secondary publishers, and given that the record in this case consists of 44 volumes, we decline to cull the record on Stewart's behalf to determine whether such evidence exists. See *Chancey v. Peachtree Pest Control Co.*, 288 Ga. App. 767, 769 (1) (655 SE2d 228) (2007). Thus, absent evidence of fault on the part of the secondary publishers, the trial court is directed on remand to enter judgment in their favor on all of Stewart's claims.

5. The remaining defendants, Smith and St. Martin's Press, contend that the court erred in denying summary judgment on Stewart's invasion of privacy and infliction of emotional distress claims, arguing that Stewart simply recast her defamation claim under these alternate legal theories.

(a) Stewart's complaint asserts two invasion of privacy claims: (i) the public disclosure of embarrassing private facts, and (ii) publicity which unreasonably placed her in a false light in the public eye.

---

[15] See also *Bindrim v. Mitchell*, 92 Cal. App.3d 61, 74 (I) (1979), disapproved on other grounds, *McCoy v. Hearst Corp.*, 727 P2d 711, 719, n. 9 (Cal. 1986), in which the court found that there was sufficient evidence that the publisher acted with actual malice when it published a paperback version of a novel about a public figure. The court found that,

> prior to the paperback printing there were surrounding circumstances to suggest inaccuracy, such that at that point [the publisher] had a duty to investigate. . . . The jury could have inferred that at that point [the publisher] either had serious doubts, or should have had serious doubts, as to the possibility that plaintiff was defamed by [the novel] and that at that point [the publisher] had some duty to investigate.

(Footnote omitted.) Id. It follows that, if the publisher's failure to investigate under such circumstances is sufficient to establish actual malice, then it would also be sufficient to demonstrate ordinary negligence.

(i) Stewart claims that Smith disclosed actual events in her (Stewart's) life that, until the book's publication, were private, secluded facts and that were not matters of public knowledge.[16] In order to sustain a claim for public disclosure of embarrassing private facts, Stewart must demonstrate the defendants' public disclosure of private facts about her that are highly offensive and objectionable to a reasonable person of ordinary sensibilities and that are not matters of public concern. *Thomason v. Times-Journal*, 190 Ga. App. 601, 604 (4) (379 SE2d 551) (1989); *Cabaniss v. Hipsley*, 114 Ga. App. 367, 372 (2) (151 SE2d 496) (1966); Restatement of Torts 2d, § 652D. This claim differs from one for defamation, because the statements at issue are true, but involve private matters.[17] Accordingly, the defendants' argument that Stewart simply recast her defamation claim under this alternative theory must fail. Further, because jury issues remain concerning this claim, the trial court properly denied the motions for summary judgment by Smith and St. Martin's Press on this claim.

(ii) Stewart's false light claim is based upon Smith's description of SuSu (and, consequently, her) as an "atheist and right wing reactionary who engages in frequent, tawdry sex and drinks to alcoholic excess." According to Stewart's complaint, she is not an atheist, right-wing reactionary, or promiscuous alcoholic. In order to sustain a false light invasion of privacy claim, a plaintiff must show that the defendant knowingly or recklessly published falsehoods about him or her and, as a result, placed him or her in a false light which would be highly offensive to a reasonable person. *Thomason v. Times-Journal*, 190 Ga. App. at 604 (4); Restatement of Torts 2d, § 652E. "In order to survive as a separate cause of action, a false light claim must allege a nondefamatory statement. If the statements alleged are defamatory, the claim would be for defamation only, not false light invasion of privacy." (Citation omitted.) *Bollea v. World Championship Wrestling*, 271 Ga. App. at 557, n. 1.

Having reviewed Stewart's claims, we conclude that her false light invasion of privacy claim is encompassed by her defamation claim, which is based upon the same allegations. See *Bollea v. World Championship Wrestling*, 271 Ga. App. at 557, n. 1. Therefore, the

---

[16] We decline to specifically list the events herein because to do so would simply perpetuate the dissemination of these allegedly private facts.

[17] To the extent the defendants argue on appeal that there is evidence that the matters at issue were not completely private but instead were known to a few of Stewart's friends, they have failed to show that they raised this argument in the court below. This Court does not rule upon arguments raised for the first time on appeal. *Boggs v. Madison County*, 240 Ga. App. 849, 852 (524 SE2d 252) (1999) ("An appellant cannot travel on one ground below, find the wind blowing in another direction, change tack, and head elsewhere on appeal.") (citation omitted).

trial court is directed to grant summary judgment to the defendants on this claim upon remand.

(b) Stewart's complaint also asserts claims for negligent infliction of emotional distress against Smith and St. Martin's Press, and intentional infliction of emotional distress against Smith only.

> In a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury. On the other hand, where the conduct is malicious, wilful or wanton, recovery can be had without the necessity of an impact. . . . [Even so,] malicious, wilful or wanton conduct will not warrant a recovery for the infliction of emotional distress if the conduct was not directed toward the plaintiff.

(Citations omitted.) *Ryckeley v. Callaway*, 261 Ga. 828, 828-829 (412 SE2d 826) (1992); see also *Carter v. Willowrun Condo. Assn.*, 179 Ga. App. 257, 260 (5) (345 SE2d 924) (1986) ("The legal remedy where one is allegedly injured by words published to a third person is an action for defamation."). In this case, there is no evidence of a physical injury resulting from the defendants' alleged negligence, nor is there any evidence that Smith's actions in writing and publishing the book were directed toward Stewart. Therefore, Stewart's emotional distress claims must fail. On remand, the trial court is directed to grant summary judgment to the defendants on those claims.

*Judgment affirmed in part and reversed in part, and case remanded with direction. Andrews, P. J., and Adams, J., concur.*

DECIDED MARCH 28, 2008 —
RECONSIDERATION DENIED APRIL 14, 2008

*Dow & Lohnes, Peter C. Canfield, Thomas M. Clyde, Lesli N. Green*, for appellants.

*Krevolin & Horst, Jeffrey D. Horst, Joann Brown-Williams*, for appellee.

*Kilpatrick Stockton, Joseph M. Beck, Jill Warner*, amici curiae.