**March 30, 2016**

# In the Court of Appeals of Georgia

A15A2334. MAYOR AND CITY COUNCIL OF THE CITY OF    JE-111
    RICHMOND HILL et al. v. MAIA.

ELLINGTON, Presiding Judge.

This appeal arises from an action by Laura Lane Maia, following the death by suicide of her daughter, Sydney Sanders, against the Mayor and City Council of the City of Richmond Hill (collectively, the "City") and Douglas Sahlberg, in his individual and official capacities, seeking compensatory and punitive damages for wrongful death, intentional infliction of emotional distress, invasion of privacy, and for the deceased's pain and suffering.[1] Following our grant of their application for interlocutory appeal, the appellants appeal from the trial court's denial of their motion

---

[1] Maia pursued her claims individually, as Sanders's parent and natural guardian, and as administratrix of Sanders's estate.

for summary judgment. For the reasons set forth below, we affirm in part and reverse in part.

> A party is entitled to summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). On appeal from the grant [or denial] of summary judgment, we construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences. The party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact. Our review of the grant or denial of a motion for summary judgment is de novo.

(Citations and punctuation omitted) *Johnson v. Omondi*, 294 Ga. 74, 75-76 (751 SE2d 288) (2013).

Viewed in a light most favorable to Maia as the nonmoving party, the evidence shows that on February 14, 2011, Maia's then 14-year-old daughter, Sydney Sanders, attempted suicide by cutting her neck and stabbing her chest and abdomen. Sahlberg and Dana Strickland, officers with the Richmond Hill Police Department ("RHPD"), responded to the hospital to investigate. Strickland photographed Sanders's injuries.[2]

---

[2] Strickland denied photographing Sanders's chest injuries.

Sanders remained hospitalized until February 23, 2011. While Sanders was in the hospital, news of her suicide attempt spread at her high school. According to Sanders's boyfriend, H. H., "everybody knew after a couple days what happened." On the day Sanders was released from the hospital, she met with friends and told them that they had one opportunity to ask her about the incident, but that she did not want to discuss it after that. Sanders disclosed to her friends that she had cut herself in her neck, abdomen, and chest.

On or about February 26, 2011, Sahlberg's daughter, K. S., who attended school with Sanders, expressed concern to her father about why someone like Sanders would attempt to commit suicide. As the conversation progressed, he became concerned that his daughter did not appreciate the serious nature of suicide. Sahlberg then logged into his password-protected work computer and showed K. S. the photographs that Strickland had taken of Sanders's injuries. Sahlberg deposed that he did not print the photographs of Sanders's injuries for his daughter, that he did not allow his daughter to copy, disseminate, or possess the photographs, and that he did not disseminate the photographs to anyone else.

One of Sanders's classmates deposed that on either February 28 or March 1, 2011, K. S. showed her a photograph of the injury to Sanders's breast and a

3

photograph of the injury to Sanders's abdomen, and that at least two other classmates were present when the photographs were shown. A second classmate of Sanders averred that K. S. "pulled out her phone and showed [her and another girl] a picture of [Sanders's] cut on her [breast]." After her return to school the week of February 28, 2011, Sanders learned that K. S. had been showing photographs of her injuries. After Sanders found out that the photographs had been displayed at school, Maia saw that Sanders was "mortified" and "screaming and yelling and gasping for breath and crying[.]"

On April 1, 2011, Strickland learned that Sahlberg had shown the photographs of Sanders's injuries to K. S., and that K. S. had told others about the photographs. Strickland informed Sahlberg that he had violated RHPD policy in disclosing the photographs. That policy, entitled "Duty to Refrain from Disclosing any Information Relating to Police Activities," provided that "[d]iscussion of the operations and official business of the department . . . which is of a confidential nature without the permission of a supervisor is prohibited." Sahlberg acknowledged his violation and Strickland counseled him to "reflect on how disseminating confidential information can affect the victims and this department." Sahlberg was disciplined for the infraction.

4

On the afternoon of April 5, 2011, RHPD officers responded to a report of a suspicious person at Sanders's home. Police discovered that H. H. was in the house with Sanders, who had stayed home from school that day. Maia received word of the incident and returned home, where she declined the officers' request to press charges against H. H. Maia then took Sanders to her high school to meet with H. H. and his mother, who was the assistant principal.

According to Maia, during the ride to the school, Sanders expressed, "[w]hat more can they do to me[?] Great. The police have been at the house and now what are they going to do and say[?]" Sanders also told Maia on that day that she was upset about how the police had talked to her and belittled her, and Sanders said, "they've showed the pictures, now what are they going to do to me[?] What more can they do to me[?]"

At the meeting at Sanders's school, Maia and H. H.'s mother decided that Sanders and H. H. should not see each other outside of school. Maia then took Sanders to see Sanders's coach and mentor, Angie Hummeldorf. Sanders stated in front of the two adults that "she didn't want to be here anymore," and wished her suicide attempt had been successful, after which Maia stepped out of the room, and Hummeldorf and Sanders discussed why Sanders felt that way. Hummeldorf testified

5

that, after she asked Sanders why she would want to take her life, Sanders "just kind of went on a rampage." Sanders informed Hummeldorf of several frustrations, which included the photographs and that "those pictures are going around." During the conversation, Sanders also said that her mother was disappointed in her, that girls were gossiping about her, and she mentioned her problems with her sister and H. H. After the discussion, Hummeldorf told Maia that Sanders "wasn't doing so good" and should not be left alone.

Maia and Sanders then drove to Maia's workplace, after which Maia dropped Sanders off at Sanders's friends' house at approximately 4:00 p.m. Another friend picked Sanders up between 6:00 p.m. and 7:00 p.m. The two talked for about 30 to 45 minutes, after which the friend dropped Sanders off at Sanders's house. After her friend left, at 7:49 p.m. Sanders spoke with Maia, who was still at work, on the phone. Maia was not concerned that Sanders was then about to harm herself. When Maia returned home at approximately 8:45 p.m. she discovered that Sanders had committed suicide by hanging.

1. As a threshold issue with respect to the liability of the City and of Sahlberg, in his official capacity, we consider the appellants' contention that the ante litem notice was deficient other than for the claim for wrongful death, and that the City and

6

Sahlberg, in his official capacity, were consequently entitled to summary judgment on Maia's claims for intentional infliction of emotional distress, invasion of privacy, and Sander's pre-death pain and suffering (also known as a survival claim).[3] As to Maia's claim for intentional infliction of emotional distress, the complaint alleged that the publication of the photographs was intentional or reckless, extreme and outrageous, and caused Maia, personally, severe emotional distress. Maia's claims for invasion of privacy and Sanders's pre-death pain and suffering alleged injuries to Sanders caused by the alleged breach of duty by Sahlberg in the distribution of the photographs.

Ante litem notice, as contemplated under OCGA § 36-33-5, is a prerequisite to filing suit against a municipality. The ante litem notice requirement also applies to claims against municipal employees in their official capacity. See *Conley v. Dawson*, 257 Ga. App. 665, 667 (1) (572 SE2d 34) (2002). OCGA § 36-33-5 (b) provides:

---

[3] Under Georgia law, Maia was entitled, as the representative of Sanders's estate, to seek damages for Sanders's pre-death pain and suffering as a survival claim. See *Carroll Fulmer Logistics Corp. v. Hines*, 309 Ga. App. 695, 696-697 (710 SE2d 888) (2011). Maia was also authorized to seek damages on behalf of Sanders's estate for invasion of privacy, which was a claim for a tort committed against Sanders before her death. See OCGA § 9-2-41 ("No "action or cause of action for the recovery of damages for . . . injury to the person . . . [shall] abate by the death of either party.").

7

Within six months of the happening of the event upon which a claim against a municipal corporation is predicated, the person, firm, or corporation having the claim shall present the claim in writing to the governing authority of the municipal corporation for adjustment, stating the time, place, and extent of the injury, as nearly as practicable, and the negligence which caused the injury. No action shall be entertained by the courts against the municipal corporation until the cause of action therein has first been presented to the governing authority for adjustment.

Substantial compliance with the statutory provisions is all that is required. See *Owens v. City of Greenville*, 290 Ga. 557, 561 (4) (722 SE2d 755) (2012).

The information supplied [in any given ante-litem notice] will be deemed sufficient if it puts a municipality on notice of the general character of the complaint, and, in a general way, of the time, place, and extent of the injury. The act recognizes, by the use of the words 'as nearly as practicable,' that absolute exactness need not be had.

(Citation and punctuation omitted.) Id. at 562 (4). And, "[t]o comply substantially, the notice must contain sufficient information so that the City can investigate the injuries alleged and determine if the claim should be settled without litigation." (Citations omitted.) *City of Moultrie v. Price*, 310 Ga. App. 672, 673 (713 SE2d 880) (2011).

8

The notice at issue, which identified Maia as the surviving parent, provided that, "[p]ursuant to [OCGA] § 36-33-5" it was "the requisite pre-suit ante litem notice of the claim for damages pertaining to the death" of Sanders. The notice asserted that Strickland and Sahlberg photographed Sanders's injuries on February 14, 2011, that the photographs were subsequently distributed to Sanders's classmates, including Sahlberg's daughter, and that the City's "negligence in allowing the distribution of these photographs and the willful, malicious, and reckless conduct" shown by the City and its officers "caused [Sanders] to hang herself on April 5, 2011." The notice also alleged that "the City is legally obligated to answer, by way of monetary damages in the amount of at least $5,000,000.00, for the full value of [Sanders's] life as well as the loss of love, society and companionship suffered by" Maia and Sanders's sister.

The ante-litem notice put the City on notice of a claim by Maia, as Sanders's surviving parent, for wrongful death, and the appellants do not contest that the notice was sufficient to that extent. The notice, however, does not reference any claims on behalf of Sanders's estate or identify Maia as the administratrix of Sanders's estate, and does not present for adjustment claims by the estate for Sanders's pre-death pain and suffering or for invasion of Sanders's privacy. See *Jones v. Austell*, 166 Ga. App.

9

808, 809 (305 SE2d 653) (1983) (notice of a personal injury claim by a tenant was not sufficient ante litem notice of a property damage claim by the landlord); *Jones v. City Council of Augusta*, 100 Ga. App. 268, 269 (6) (110 SE2d 691) (1959) (notice to the city of a claim by parents of minor child for negligence, which described the injury to the child and requested reimbursement for medical expenses, was not notice of a claim by the child for personal injury).

As for Maia's individual claim for intentional infliction for emotional distress, "the statute requires the notice to state the 'extent of the injury,' which we have defined as 'the nature, character, and particulars of the injury.'" (Punctuation and footnote omitted.) *Davis v. City of Forsyth*, 275 Ga. App. 747, 748 (1) (621 SE2d 495) (2005). The notice describes an injury to Sanders on account of the alleged distribution of photographs depicting Sanders, and does not state that Maia had suffered any personal injury on that account. Thus, "the City could not determine whether any such claim should be settled without litigation." Id. See *Rabun v. McCoy*, 273 Ga. App. 311, 314-315 (1) (615 SE2d 131) (2005) (ante-litem notice referring to claims arising out defamatory statements said nothing regarding a claim for intentional infliction of emotional distress or a claim for invasion of privacy and failed to provide notice of such claims). The ante-litem notice was not sufficient as

10

to the claims for Sanders's pre-death pain and suffering, invasion of her privacy, or for Maia's individual claim for intentional infliction of emotional distress, and the trial court erred in failing to grant summary judgment to the City and to Sahlberg, in his official capacity, as to those claims.

2. The appellants contend that the trial court erred in denying their motion for summary judgment on Maia's wrongful death and survival claims because proximate cause cannot be established. In a related argument, the appellants contend that, in the absence of any evidence that Sahlberg's conduct, an alleged breach of a ministerial duty, was the proximate cause of Sanders's death, Sahlberg in his individual capacity is entitled to official immunity for these claims.[4]

---

[4] Public agents are immune from liability for their discretionary acts unless they are done with malice or intent to injure: The doctrine of official immunity, also known as qualified immunity, protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure.

(Punctuation and footnote omitted.) *City of Atlanta v. Shavers*, 326 Ga. App. 95, 97-98 (2) (b) (756 SE2d 204) (2014). See Ga. Const. of 1983, Art. I, Sec. II, Para. IX (d) (claims against state officers and employees); *Common Cause/Ga. v. City of Atlanta*, 279 Ga. 480, 482 (2) (614 SE2d 761) (2005) (As amended in 1991, the Georgia Constitution allows suit against a municipal officer in his or her personal capacity if

11

"To recover damages in a tort action, a plaintiff must prove that the defendant's negligence was both the cause in fact and the proximate cause of the injury." (Punctuation omitted.) *Atlanta Obstetrics & Gynecology Group v. Coleman*, 260 Ga. 569 (398 SE2d 16) (1990).

> Proximate cause is that which[,] in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred. What amounts to proximate cause is undeniably a jury question and is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent.

(Citation and punctuation omitted.) *Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003). In other words, "[q]uestions of negligence and proximate cause are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases. Only in the rare case where there is an admission of liability or an indisputable fact situation that clearly establishes liability, should summary judgment be granted." (Citations and punctuation omitted.) *Gulf Life Ins. Co. v. Folsom*, 256 Ga. 400, 404 (349 SE2d 368) (1986).

---

such officer negligently performed, or failed to perform, a ministerial duty, or acted with actual malice or with actual intent to cause injury.).

12

The appellants suggest that there was no causal link between Sahlberg's conduct and Sanders's suicide, pointing to evidence, inter alia, that a month elapsed after Sahlberg's disclosure to his daughter of the photographs of Sanders's injury, that there were other, more recent events, that likely triggered Sanders's decision to kill herself, and that she was in a calm frame of mind when she committed suicide. We disagree. A trier of fact could conclude that Sahlberg breached his duty to Sanders by revealing her confidential information to his daughter in violation of RHPD policy. A jury could infer that this breach of duty was a cause in fact of Sanders's suicide in light of evidence that, on the day of the suicide, Sanders remained severely distraught by the conduct of the RHPD in releasing her confidential information, as shown by her comments to Maia, and that Sanders referred to the dissemination of the photographs, among other things, when Hummeldorf asked her why she wanted to take her life.

The appellants maintain that Sahlberg's breach of duty can nevertheless not be a proximate cause of Sanders's injury, and, consequently, no recovery may be had, because her suicide was an unforseen intervening cause of her death as a matter of law. We have held that, "where injuries resulting from the negligence of a third person produce a state of mind in the injured person which leads to [her] suicide, the

13

person guilty of the negligence is not civilly responsible for the suicide." (Citation and punctuation omitted.) *Appling v. Jones*, 115 Ga. App. 301, 303 (1) (154 SE2d 406) (1967) (physical precedent only). As we explained in *Appling*, an act of suicide "is a new and independent agency which does not come within and complete a line of causation from the wrongful act to the death and therefore does not render defendant liable for the suicide." (Citation and punctuation omitted.) Id. *Appling* aligned Georgia with the general rule that "suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability." (Footnote omitted.) *Dry Storage Corp. v. Piscopo*, 249 Ga. App. 898, 900 (550 SE2d 419) (2001).

Notwithstanding this general rule, in assessing claims of negligence against medical professionals and institutions arising out of the suicide of a patient or former patient, we have not characterized the act of suicide as a per se intervening or superceding act that must preclude liability, if an intervening act at all. See, e. g., *Purcell v. Breese*, 250 Ga. App. 472, 474-475 (1) (552 SE2d 865) (2001); *Brandvain v. Ridgeview Institute*, 188 Ga. App. 106, 115-116 (3) (b) (372 SE2d 265) (1988). Rather, where the suicide "is a reasonably foreseeable consequence of the defendant's negligent conduct, the legal, causal connection between that conduct and injury is not broken." (Citation, footnote, and punctuation omitted.) *Brandvain v. Ridgeview*

14

*Institute*, 188 Ga. App. at 116 (3) (b). The reason for the inconsistency with the general rule in these cases logically lies in the duty owed by the defendants to the deceased. "While there is no duty to guarantee that a patient will not commit suicide, Georgia has long recognized a duty with regard to treatment of patients by doctors and other individual health care professionals as well as private hospitals[.]" Id. at 112 (2).[5]

As Sahlberg was not a medical professional, nor was Sanders in his custody or care, we agree with the appellants that the cases in which the defendants stood in such a relationship to the deceased are distinguishable to that extent. Nevertheless, Sahlberg did owe a specific duty not to disclose Sanders's confidential information. His duty to protect the public, and particularly Sanders, can be contrasted to the breach of duty in *Appling*, which concerned the defendant's negligence in colliding with an automobile driven by the plaintiff's son. See *Appling v. Jones*, 115 Ga. App.

---

[5] As to physicians, "the duty is that inherent in the doctor-patient relationship, which, if breached by failure to exercise the requisite degree of skill and care, with that failure being the proximate cause of the injury, will result in liability." (Citations omitted.) *Brandvain v. Ridgeview Institute*, 188 Ga. App. at 112 (2). A private hospital "is under the duty to exercise such reasonable care in looking after and protecting a patient as the patient's condition, which is known to the hospital through its agents and servants charged with the duty of looking after and supervising the patient, may require." (Citation and punctuation omitted.) Id.

at 301. As we noted in *Appling*, the "subsequent intervening act of suicide was certainly not such a usual or foreseeable consequence or normal incident of such a collision as to make the defendants' negligence actionable." Id. at 307 (2). Here, however, Sahlberg had reason to know that Sanders was peculiarly vulnerable because he had investigated her suicide attempt. And as Sahlberg owed a special duty to protect the public and Sanders, in particular, we find this case to be more akin to *Brandvain* than to *Appling*. Accordingly, we find that, if Sanders's suicide was a reasonably foreseeable consequence of Sahlberg's negligent conduct, her act of suicide was not an intervening act that would preclude Sahlberg's breach of duty from constituting the proximate cause of that injury. See *Brandvain v. Ridgeview Institute*, 188 Ga. App. at 116 (3) (b); *Knight v. Wal-Mart Stores*, 889 FSupp. 1532, 1542 (III) (C) (3) (S.D. Ga. 1995) (noting that cases that rely on a pure foreseeability approach in assessing whether a suicide was a proximate cause of the defendant's negligence "find that suicide does not relieve a defendant of liability for wrongful death when the defendant had reason to know of the risk of suicide. These cases usually involve defendants having . . . a special duty to the public."). Given the sensitive nature of the photographs and Sahlberg's knowledge that Sanders had previously tried to take her own life, it is not plain and palpable that Sanders's suicide was not a foreseeable

16

consequence of Sahlberg's breach of duty, and the trial court properly reserved the issue for the jury.

The City further argues that as there is no evidence that Sahlberg gave copies of the photographs to his daughter, but only allowed her to view them, K. S.'s "theft" of the photographs was an intervening act not foreseeable or triggered by Sahlberg's disclosure. As a rule,

> there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent act or omission of someone other than the defendant, *which was not foreseeable by defendant, was not triggered by defendant's act,* and which was sufficient of itself to cause the injury.

(Citation and punctuation omitted; emphasis supplied.) *La Quinta Inns, Inc. v. Leech*, 289 Ga. App. 812, 816 (1) (658 SE2d 637) (2008). In other words, the intervening wrongful act does not insulate the defendant from liability "if the defendant had reasonable grounds for apprehending that such wrongful act would be committed." (Citation and punctuation omitted.) *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686 (2) (572 SE2d 533) (2002). Here, it is not plain and palpable that Sahlberg had no reasonable grounds to apprehend that his disclosure of the photographs of a classmate to his teenaged daughter might motivate her to then obtain and distribute

17

them. The trial court did not err in allowing the issue of proximate cause to be considered by a jury and in denying the appellants' motion for summary judgment on Maia's wrongful death and survival claims.[6]

3. As to Sahlberg in his individual capacity, the appellants contend, inter alia, that the trial court erred in denying their motion for summary judgment as to Maia's claim for intentional infliction of emotional distress because there is no evidence that Sahlberg's allegedly tortious conduct was directed toward Maia.[7]

> In a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury. On the other hand, where the conduct is malicious, wilful or wanton, recovery can be had without the necessity of an impact. . . . [E]ven malicious, wilful or wanton conduct will not warrant a recovery for the infliction of emotional distress[, however,] if the conduct was not directed toward the plaintiff.

---

[6] In light of the inadequacy of the ante-litem notice of Maia's survival claim, as we held in Division 1, supra, only Sahlberg in his individual capacity can be held liable on the survival claim.

[7] The City and Sahlberg, in his official capacity, were entitled to summary judgment on this claim for the reasons set forth in Division 1, supra.

(Citations omitted.) *Ryckeley v. Callaway*, 261 Ga. 828, 828-829 (412 SE2d 826) (1992).[8] As the appellants contend, there is no evidence that Sahlberg's conduct, that is showing his daughter photographs of Sanders's injuries, was directed toward Maia.

Instead of pointing to evidence that Sahlberg's conduct was directed toward her, Maia contends that the appellants are not entitled to summary judgment on her claim for intentional infliction of emotional distress because there is evidence that she suffered a non-physical injury to her person and incurred pecuniary losses, citing *Oliver v. McDade*, 328 Ga. App. 368, 370 (2) (772 SE2d 701) (2014), affirmed in part and vacated in part, *Oliver v. McDade*, 297 Ga. 66 (772 SE2d 701) (2015). In *Oliver v. McDade*, we referenced the rule that "a plaintiff may recover damages for

---

[8] See also *Hamilton v. Powell, Goldstein, Frazer & Murphy*, 252 Ga. 149, 150 (311 SE2d 818) (1984) ("As a general precept, damages for mental distress are not recoverable in the absence of physical injury where the claim is premised upon ordinary negligence. However, when the claim is for intentional misconduct, damages for mental distress may be recovered without proof of physical injury.") (citations omitted); *Montega Corp. v. Hazelrigs*, 229 Ga. 126, 127 (189 SE2d 421) (1972) ("In cases where mere negligence is relied on, before damages for mental pain and suffering are allowable, there must also be an actual physical injury to the person, or a pecuniary loss resulting from an injury to the person which is not physical; such an injury to a person's reputation, or the mental pain and suffering must cause a physical injury to the person. In cases where mere negligence is not relied on, but the conduct complained of is malicious, wilful, or wanton, mental pain and suffering may be recovered without the attendant circumstances mentioned above.") (citation and punctuation omitted).

emotional distress *flowing from a defendant's negligence*, notwithstanding the absence of physical injury" if, but only if, "the plaintiff has suffered a pecuniary loss and has suffered an injury to the person, albeit not physical." (Punctuation and footnote omitted; emphasis supplied.) 328 Ga. App. at 370 (2), vacated on other grounds, *Oliver v. McDade*, 297 Ga. at 68.[9] Because Maia does not base her claims on any allegations of negligence, Georgia's impact rule does not apply. *Ryckeley v. Callaway*, 261 Ga. at 829-830; *Hamilton v. Powell, Goldstein, Frazer & Murphy*, 252 Ga. 149, 150 (311 SE2d 818) (1984); *Sanders v. Brown*, 178 Ga. App. 447, 450 (1) (343 SE2d 722) (1986). And, because the impact rule does not apply, it follows that Maia's reliance on the pecuniary loss exception to the impact rule is misplaced.

Because there is no evidence that the allegedly tortious conduct was directed toward Maia, the trial court erred in denying the appellants' motion for summary judgment to the extent her complaint asserts a claim for intentional infliction of emotional distress.[10] Pretermitting whether Maia's complaint can reasonably be

---

[9] See also *Coon v. The Medical Center*, __ Ga. App. __ (2) (780 SE2d 118) (2015); *Nationwide Mut. Fire Ins. Co. v. Lam*, 248 Ga. App. 134, 138 (2) (546 SE2d 283) (2001).

[10] *Smith v. Stewart*, 291 Ga. App. 86, 101 (5) (b) (660 SE2d 822) (2008) (where the plaintiff asserted a claim for intentional infliction of emotional distress, based on a character in a novel that allegedly portrayed her as alcoholic and promiscuous, the

construed as asserting a claim for *negligent* infliction of emotional distress, such that the impact rule and the pecuniary loss exception may be applicable, the record shows that the appellants did not address any such claim in their motion for summary judgment, and Maia did not address the issue in opposing the motion. Because any claim for negligent infliction of emotional distress was not presented to the trial court, any consideration on appeal of whether there is evidence to support the claim would be premature. *Oliver v. McDade*, 297 Ga. at 68.

4. As to Sahlberg in his individual capacity, the appellants further contend that the trial court erred by denying their motion for summary judgment on Maia's claim for invasion of privacy.[11] In the complaint, Maia alleges that the confidential

---

author was entitled to summary judgment because there was no evidence that the author's actions in writing and publishing the novel were directed toward the plaintiff); *Hill v. City of Fort Valley*, 251 Ga. App. 615, 617 (1) (a) (554 SE2d 783) (2001) (where the plaintiffs asserted a claim of intentional infliction of emotional distress, based on the defendant's removing their mother's casket from one plot and reburying it in the correct plot, the defendant was entitled to summary judgment because there was no evidence that its actions in moving the casket were directed toward the plaintiffs); *Sanders v. Brown*, 178 Ga. App. at 448-451 (1) (a claim for intentional infliction of emotional distress, based on the defendant spraying a child with insecticide while she stood in a garden, could be maintained only by the child, and not by any other member of her family, because the conduct was directed only toward her).

[11] The City and Sahlberg, in his official capacity, were entitled to summary judgment on this claim for the reasons set forth in Division 1, supra.

21

photographs of Sanders's person should have remained private and not published or made public to Sahlberg's daughter; that such disclosure was offensive or objectionable to a reasonable person; and that the disclosure harmed Sanders. The elements of a claim for the public disclosure of private facts[12] are:

> (a) the disclosure of private facts must be a public disclosure; (b) the facts disclosed to the public must be private, secluded or secret facts and not public ones; and (c) the matter made public must be offensive and objectionable to a reasonable man of ordinary sensibilities under the circumstances.

(Citation and punctuation omitted.) *Walker v. Walker*, 293 Ga. App. 872, 875 (2) (c) (ii) (668 SE2d 330) (2008). See also *Cox Broadcasting Corp. v. Cohn,* 420 U. S. 469, 489 (III) (95 SCt 1029, 43 LE2d 328) (1975) (describing the tort of public disclosure under Georgia law as that "in which the plaintiff claims the right to be free from

---

[12] "Invasion of privacy" encompasses four torts under a common name and include "(1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness." (Citation and punctuation omitted.) *Martin Luther King, Jr. Center &c., Inc. v. American Heritage Products*, 250 Ga. 135, 142 (1) (296 SE2d 697) (1982). Maia does not contest the appellants' characterization of her claim for invasion of privacy as the tort of public disclosure of private facts.

unwanted publicity about his private affairs, which, although wholly true, would be offensive to a person of ordinary sensibilities").

The appellants maintain, among other things, that there is a lack of evidence sufficient to show a public disclosure in that Sahlberg only showed the photographs to his daughter. Maia responds that there is no "mandatory authority" that publication to a single individual cannot meet the public disclosure requirement, and that public disclosure remains an issue of fact that should be resolved by a jury.

Neither party has cited, and we are unaware of, any controlling Georgia authority as to what constitutes a "public disclosure" of a private fact. However, as explained in the comments to the Restatement of Torts 2d, "to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons" is not sufficient to constitute a public disclosure. Restatement of Torts 2d, § 652D (comment a).[13] "On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large

---

[13] Georgia courts have cited to the Restatement of Torts as persuasive authority in the context of claims for invasion of privacy. See, e.g., *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 705 n. 2 (409 SE2d 835) (1991); *Smith v. Stewart*, 291 Ga. App. 86, 100 (5) (a) (i) (660 SE2d 822) (2008).

23

audience, is sufficient" to constitute a public disclosure. Id. Whether oral, written, or by other means, the publicity given to the private life of the individual must be "a communication that reaches, or is sure to reach, the public." Id. Here, even if Sahlberg's disclosure was otherwise wrongful, it was a private communication to his daughter and not to the public, nor was the disclosure of the photographs "sure to reach" the public. See *Price v. Scranton Sch. Dist.*, Civil Action No. 11-0095 (2012 U.S. Dist. LEXIS 1651, *47) (M.D. Pa. January 6, 2012) (dismissing invasion of privacy claim based on disclosure of a minor's vaginal infection to students at her school and a neighboring school as "the publication was not so widespread that it was communicated to the public at large, or to so many people that it was 'substantially certain' to become public knowledge"). The trial court erred in denying the appellants' motion for summary judgment as to this claim.

5. Lastly, the appellants contend that the trial court erred in failing to grant summary judgment to the City and Sahlberg, in his official capacity, as to Maia's claims for punitive damages. We agree, and Maia concedes that the trial court erred in this respect. See *City of Columbus v. Myszka*, 246 Ga. 571, 573 (4) (272 SE2d 302) (1980) (holding that absent explicit statutory authority a municipality cannot be held liable for punitive damages).

24

*Judgment affirmed in part and reversed in part. Phipps, P. J., concurs. Barnes, P. J., and McMillian J., concur fully in part and concur in the judgment only. Dillard, Ray, and Peterson JJ., concur in part and dissent in part.*

A15A2334. MAYOR AND CITY COUNCIL OF THE CITY OF    JE-111
    RICHMOND HILL et al. v. MAIA et al.

BARNES, Presiding Judge, concurring specially.

This case should not turn on whether the suicide victim killed herself in a rage, frenzy, or due to an uncontrolled impulse, or on whether the defendants had a special relationship with her. It should instead turn on a straightforward application of the tort concept of foreseeability. Applying that concept, a reasonable jury could find that

the defendant police officer had reason to know that Sydney was particularly susceptible to suicide, and that her subsequent suicide was a foreseeable result of his sharing confidential information. Accordingly, the trial court did not err in denying summary judgment to the defendants on Maia's wrongful death claim.

While I agree with the majority's conclusion in Division 2 that the trial court did not err in denying the defendants' motion for summary judgment as to the plaintiff's wrongful death claims, I cannot agree with all that is said, and thus concur specially in that division. I concur fully in the analysis and conclusions in Divisions 1, 3, 4, and 5.

To analyze the legal principles in this case, both the majority and the dissent apply the framework articulated in *Appling v. Jones*, 115 Ga. App. 301 (154 SE2d 406) (1967) (physical precedent only) and developed in the 50 years that followed. That framework, which is not unique to Georgia, provides that "[g]enerally, suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability," unless the injured party kills herself while in a rage, frenzy, or due to an

uncontrollable impulse. *Dry Storage Corp. v. Piscopo*, 249 Ga. App. 898, 900 (550 SE2d 419) (2001).[1]

After establishing the holding that suicide absolves the tortfeasor absent evidence that the victim killed herself in a rage, frenzy, or due to an uncontrolled impulse, our appellate courts have created exceptions to this holding, as ably described by the majority and dissent. Some of those exceptions involve defendants who have a special relationship to the injured party, such as psychiatrists;[2] others involve defendants who have physical custody and control over the injured party, such as jailers;[3] and still others involve both a special relationship and physical custody.[4] In this case, the majority finds a public duty exception to *Appling*'s holding, based on the defendant police officer's special duty not to disclose confidential

---

[1]See also *La Quinta Inns v. Leech*, 289 Ga. App. 812, 817 (1) (658 SE2d 637) (2008); *Harvey v. Nichols*, 260 Ga. App. 187, 193-194 (2) (581 SE2d 272) (2003); *Kobeck v. Nabisco*, 166 Ga. App. 652, 654 (3) (305 SE2d 183) (1983); and other cases cited infra in footnotes 2 and 3.

[2]See, e.g., *Peterson v. Reeves*, 315 Ga. App. 370, 372-378 (2), (3) (727 SE2d 171) (2012).

[3]See, e.g., *Tucker v. Pearce*, 332 Ga. App. 187, 191-193 (771 SE2d 495) (2015), cert. granted, *Pearce v. Tucker*, Case No. S15C1310 (Sept. 8, 2015).

[4]See, e.g., *Brandvain v. Ridgeview Institute*, 188 Ga. App. 106, 112-118 (372 SE2d 265) (1988).

3

information. The dissents find no special-relationship exception and would hold that, because the record contains no evidence the victim acted from rage, frenzy, or uncontrolled impulse, the trial court should have granted summary judgment to the defendants.

But this case does not turn on whether the suicide was "voluntary" or not, or on whether a special relationship existed between the victim and police officer, but rather on a straightforward application of the tort concept of foreseeability. Foreseeability informed the analysis in *Stevens v. Steadman*, 140 Ga. 680, 685 (79 SE 564) (1913), upon which *Appling* relied, in which our Supreme Court found that suicide was not "the legal and natural result" of the defendant-authors' malicious letter to the deceased.[5]  See C. T. Drexler, Annot., Civil Liability for Death by Suicide, 11 A.L.R.2d 751 (1950); 22A Am. Jur. 2d Death § 41 (2016) ("The general rule in actions brought under a wrongful death statute is that suicide is an intervening

---

[5]The plaintiffs in *Stevens* alleged that the defendants' conduct rose to the level of a criminal conspiracy, and thus went beyond negligence; the plaintiff's allegation of criminal conduct explains why the Supreme Court determined that the defendants could not have been guilty of the crime of murder. 140 Ga. at 686-687. The earliest wrongful death statutes allowed a plaintiff to recover damages only if the defendant had acted criminally; in 1887, the statute was amended to also encompass deaths caused by ordinary negligence. *Thompson v. Watson*, 186 Ga. 396, 409 (197 SE 774) (1938). See, e.g., *McDonald v. The Eagle and Phenix Mfg. Co.*, 68 Ga. 839 (1882); *Daly v. Stoddard*, 66 Ga. 145 (1880).

force that breaks the line of causation from the wrongful act to death[,] ... based on the theory that suicide is not an ordinary, foreseeable result of injury."). Foreseeability also explains why we have created exceptions to the holding in *Appling* for special relationships involving treatment or control over the deceased.

Other courts have distinguished the holding set forth in *Appling* on foreseeability grounds, i.e., *Sneider v. Hyatt Corp.*, 390 F. Supp. 976, 980-981 (N.D. Ga. 1975)[6]; *Knight v. Wal-Mart Stores*, 889 F. Supp. 1532, 1542 (S.D. Ga. 1995). As in *Knight*, this case involves a defendant who breached his duty "to a decedent who [he knew was] already contemplating the act," not a defendant who "directly, negligently creat[ed] in the decedent the state of mind prompting suicide." Id. Addressing the issue of proximate cause, the district court held, "It is basic common law that defendants remain liable where intervening acts between the negligence and the ultimate harm were foreseeable." Id. at 1541. See also *Bornmann v. Great Southwest General Hospital*, 453 F.2d 616, 624 (I) (B) (5th Cir. 1971) ("The cases disapproving suicide as a 'new and independent cause' generally involve situations

---

[6]The court in *Sneider* denied summary judgment to a hotel in a suit to recover for the wrongful death of a woman who had jumped from the twenty-first floor to the lobby floor, and the hotel employees had received phone calls informing them of the woman's suicidal tendencies.

5

where the defendant knows of the suicidal risk or has undertaken a specific duty to prevent suicide.")

Further, while no Georgia appellate cases specifically distinguish *Appling* in the manner of the two federal cases cited above, that may be because in many cases, the parties or this Court do not address the issue of suicide through the framework of special relationships or whether the deceased acted in a rage, frenzy, or due to an uncontrolled impulse; rather, in those cases the suicide issue is reviewed using general concepts of foreseeability and qualified immunity. See, e.g., *Hill v. Jackson*, ___ Ga. App. ___ (Case No. A15A1778, decided March 24, 2016) (defendant performing ministerial function, no qualified immunity); *Georgia Clinic v. Stout,* 323 Ga. App. 487, 492-493 (2), 494-495 (5), 496-497 (6) (747 SE2d 83) (2013) (affirming wrongful death verdict based on woman's suicide three months after developing knee infection caused by malpractice); *Miranda v. Fulton DeKalb Hosp. Auth.*, 284 Ga. App. 203, 206-207 (644 SE2d 164) (2007) (no causal connection between escape from restraints at Grady and death from leaping in front of moving vehicle on highway the following day); *Minor v. Barwick*, 264 Ga. App. 327, 336-337 (2) (590 SE2d 754) (2003) (immunity under State Tort Claims Act); *Clark v. Prison Health Svcs.*, 257 Ga. App. 787, 791-792 (2), 793-794 (4) (572 SE2d 342) (2002)

6

(ministerial function, no qualified immunity); *Purcell v. Breeze*, 250 Ga. App. 472, 475 (1) (552 SE2d 865) (2001) (proximate cause of suicide in medical malpractice case was a jury issue); *Morris v. Baxter*, 225 Ga. App. 186, 187 (483 SE2d 650) (1997) (no proximate cause between leaving loaded rifle in house and girlfriend using it to kill herself; "negligence is predicated on what should have been anticipated rather than on what happened") (citation and punctuation omitted); *McDay v. City of Atlanta*, 204 Ga. App. 621, 622 (2) (420 SE2d 75) (1992) (suicide was unforeseeable); *Brandvain*, 188 Ga. App. at 115-116 (3) (b) (even if suicide were crime, a reasonably foreseeable criminal act does not break legal causal connection between negligence and damages). In other cases, we have cited *Appling* but then held simply that the suicide was not foreseeable under the circumstances presented. See, e.g. *Harvey v. Nichols*, 260 Ga. App. 187, 193-194 (2) (581 SE2d 272) (2003); *Kobeck*, 166 Ga. App. at 654 (3) (no evidence negligence was proximate cause of suicide).[7]

---

[7]Not all of these cases involve special relationships. See *Morris*, 225 Ga. App. 186. Nor were special relationships present in *La Quinta Inns*, 289 Ga. App. 812, or *Kobeck*, 166 Ga. App. 652, and while these two cases cite *Appling*, they fail to note that *Appling* is not binding precedent. The point is that we have not applied *Appling*'s rigid framework to all tort cases involving suicide, despite protestations to the contrary. Our caselaw does not foreclose our ability to analyze this case using basic tort law principles of foreseeability.

Regardless of the validity of *Appling*'s holding and its exceptions,[8] this case is different. Knowing that Sydney, a high school student, had recently attempted suicide and been hospitalized as a result, questions of fact exist about whether suicide was a foreseeable risk of the police officer showing his teenage daughter pictures of her classmate Sydney's self-mutilated body following Sydney's prior suicide attempt. The defendants admit that the officer violated policy by showing the confidential photographs to his daughter, and his supervisor testified that the officer was remorseful afterward. The record shows that, four days before Sydney committed suicide, the officer was disciplined with two days' suspension and the directive to review policy and "reflect on how disseminating confidential information can affect the victim and this department." While the officer submitted an affidavit averring that he did not give his daughter access to the pictures or database, he did not dispute that she shared those images with other students, a fact supported by classmates' affidavits that the daughter had shown them pictures of Sydney's wounds.

---

[8]The notion that, unless suicide is committed in a frenzy, rage, or irresistible impulse, it is "voluntary" and therefore breaks the chain of causation reflects an outdated view of mental health. But the continued validity of *Appling*'s holding is a discussion for another day.

A review of the record de novo, including multiple affidavits and seven depositions, reveals a portrait of a "beautiful, smart," popular, athletic high school freshman who did not like for people to see her upset. Her sister found Sydney on the morning of her suicide attempt on February 14, 2011, and described her wounds as "bad." She had taken her sister's medication and then used dull scissors to cut her neck from ear to ear "many times." She then twice stabbed her left breast and twisted the blades to reach her heart, and deeply gouged her abdomen. When her mother took her to the emergency room, initially Sydney would not tell anyone what had happened, so the responding police officers documented her wounds with photographs. The digital images were printed for a paper file and then uploaded to the police department's data management software, which the defendant officer subsequently accessed from his home to show his daughter.

After Sydney's self-inflicted wounds were sutured and bandaged at the emergency room, Maia took her to Georgia Regional Hospital, where she spent nine days. She was discharged with the diagnosis of "adjustment disorder with depressed mood," and returned to high school exactly two weeks after her February 14 suicide attempt. The cuts on her neck were almost completely healed; her sister was "shocked" at how minimal the scars were, considering how bad the wounds looked

9

when first inflicted. Her clothing covered the injuries to her breast and stomach, and she often wore a hoody with her hair down, "always trying to wear stuff to cover up the scar on her neck." One friend said she "just put a smile on every day." Her sister said "she kept her business quiet" and "made it look like she was ok," and she apparently did her best to make her family and fellow students forget about her suicide attempt. Both her sister and mother testified that Sydney cared a lot about what people thought of her and wanted to get along with everyone.

A few days after she returned to high school, about four weeks before she committed suicide, Sydney found out that the defendant investigating police officer's daughter had shown pictures of her wounds to other students, which embarrassed and distressed her. Her mother described Sydney as "mortified" when she first learned of the disclosure, screaming, yelling, crying, and gasping as she told her mother about it. Sydney told her mother that her friends had confronted her about the photos and that other students pointed, laughed, and made comments about her. She was "hysterical" because, as she said, her mother had taught her to respect police officers and she could not believe that "Mr. Doug" would "do that to [her]" instead of protect her. According to her mother, after Sydney found out about the dissemination, the defendant officer's daughter chased Sydney "every day around after school telling her

10

her daddy was going to lose his job" if he were caught and begging Sydney not to tell her mother. In the morning on April 5, 2011, police officers came to Sydney's house, and afterward Sydney was very upset about what sort of rumors and innuendos would result from that visit "because the pictures had already been seen and talked about." At one point, Sydney repeated to her mother that the police had already shared the pictures, asking, "What more can they do to me?"

In a subsequent meeting with her coach, who pointed out Sydney's assets, Sydney "started bawling" and listed some of her struggles, which included the dissemination of the pictures of her self-inflicted wounds. When her coach asked why she wanted to die, Sydney "just kind of went on a rampage" about her frustrations, which included gossiping girls "and those pictures going around." After the meeting ended, Sydney spent time with her mother and friends that afternoon and early evening. That night around seven, she told her mother over the phone that she loved her, posted on her Facebook wall that she loved her best friends, wrote notes in odd places in her room, then went up to the attic of her family's house and hanged herself.

The dissent says that 14-year-old Sydney was not in a rage, a frenzy, or acting under an uncontrollable impulse because the actions she took just before she killed herself showed she was acting voluntarily, and therefore the defendants are entitled

11

to judgment as a matter of law. We cannot assume we know Sydney's state of mind based on her outward actions. But regardless of our assumptions about her mental state, under a straightforward proximate cause and foreseeability analysis, genuine issues of material fact exist. A jury should decide whether Sydney's suicide absolves the tortfeasor of any liability for her death based on his actions in sharing photographs of Sydney's self-inflicted wounds with his daughter, Sydney's classmate, photographs he took incident to his duties as a police officer.

For these reasons, I concur specially in Division 2.

I am hereby authorized to state that McMillian, J., joins in this special concurrence.

A15A2334. MAYOR AND CITY COUNCIL OF THE CITY OF

RICHMOND HILL et al. v. MAIA.

D<small>ILLARD</small>, Judge, concurring in part and dissenting in part.

I fully concur in Divisions 1 and 3 through 5 of the majority opinion. I respectfully dissent, however, from Division 2 because, as a matter of law, the undisputed evidence shows that Sahlberg's wrongful conduct was not the proximate cause of Sanders's death by suicide. Indeed, Maia may not recover for her wrongful-death and survival claims because, under well-established Georgia law, Sanders's tragic suicide was an unforseen intervening cause of her death, which absolves Sahlberg and the City from liability for such claims.

As we have recently explained, from a legal point of view, proximate cause in this context means that the suicide "must have been a foreseeable result of the

negligence of the tortfeasor."[1] And, of course, negligence is not actionable unless it is "the proximate cause of the injury."[2] Moreover, a wrongdoer is not responsible for a consequence which is *"merely possible*, according to occasional experience, but only for a consequence which is *probable*, according to ordinary and usual experience."[3] Further, as recognized by the majority, "*[g]enerally, suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability*."[4] Nevertheless, there is an exception to this general rule: When the tortfeasor's wrongful act causes the injured party to kill herself "during a rage or frenzy, or in response to an uncontrollable impulse, [it] is considered to be the proximate cause of

---

[1] *Tucker v. Pearce*, 332 Ga. App. 187, 191 (771 SE2d 495) (2015), *cert. granted* (Sept. 8, 2015) (punctuation omitted); *accord Harvey v. Nichols*, 260 Ga. App. 187, 193 (2) (581 SE2d 272) (2003). The Supreme Court of Georgia granted certiorari in *Tucker* to consider whether this Court erred (1) by applying the "general rule" that suicide is an unforeseeable intervening cause of death, even though there was a special relationship between a detention officer and his prisoner, who committed suicide while in custody; and (2) in reversing the denial of the officer's motion for summary judgment.

[2] *Tucker*, 332 Ga. App. at 191 (punctuation omitted); *accord Harvey*, 260 Ga. App. at 193 (2).

[3] *Tucker*, 332 Ga. App. at 191 (punctuation omitted) (emphasis supplied); *accord Harvey*, 260 Ga. App. at 193 (2).

[4] *Tucker*, 332 Ga. App. at 191 (punctuation omitted); *accord La Quinta Inns, Inc. v. Leech*, 289 Ga. App. 812, 816 (1) (658 SE2d 637) (2008); *Harvey*, 260 Ga. App. at 193 (2).

2

the suicide."[5] In addition, as discussed by the majority, we have also deviated from the general rule that suicide absolves an alleged tortfeasor of liability in cases involving custodial doctor-patient relationships when the patient's suicide was alleged to have been the result of the doctor's failure to adequately care for or protect the patient from self harm.[6] But because neither of these exceptions to our general rule regarding liability for suicide applies in this case, I would reverse the trial court's denial of summary judgment to the defendants as to Maia's wrongful-death and survival claims.

As to the first exception, there is no evidence to support a jury finding that Sanders killed herself *during* a rage or frenzy, or in response to an uncontrollable impulse, such that Sahlberg's wrongful conduct, which occurred over a month before her death, may be considered the proximate cause of her suicide. To be sure, at the end of the school day on the day of her suicide, Sanders confided to a teacher (and

[5] *Tucker*, 332 Ga. App. at 191 (punctuation omitted); *accord Harvey*, 260 Ga. App. at 193 (2).

[6] *See e.g.*, *Peterson v. Reeves*, 315 Ga. App. 370, 375-78 (3) (727 SE2d 171) (2012) (physical precedent); *Purcell v. Breese*, 250 Ga. App. 472, 475 (1) (552 SE2d 865) (2001); *Brandvain v. Ridgeview Inst., Inc.*, 188 Ga. App. 106, 116 (3) (b) (372 SE2d 265) (1988); *Misfeldt v. Hosp. Auth. of City of Marietta*, 101 Ga. App. 579, 583-84 (115 SE2d 244) (1960).

3

mentor) that she was extremely distraught and that the dissemination of the pictures of her injuries at school was one of several reasons she was upset. But there is no evidence that she was acting in a "rage" or a "frenzy" several hours later when she committed suicide. To the contrary, the evidence shows that, *after* the meeting with her teacher/mentor, Sanders sent a text message to that teacher indicating her desire to "change for the better," which led her teacher to believe that Sanders was "on the upscale" because she seemed "excited and [like] she wanted to change."

Sanders then spent time with friends after school, and several hours passed from 4:00 p.m. until 7:49 p.m., when she called her mother shortly before tragically taking her own life. During this phone call, Sanders said something to the effect of "I love you mama, I promise you I'm going to be all right, I'm going to read my Bible, I love you and I will see you when you get home." According to Maia, nothing that Sanders said during the call alarmed her or caused her to be concerned that Sanders might harm herself. Thus, based on the foregoing evidence, even if Sanders's behavior during the meeting with her teacher could possibly be characterized as a "rage" or "frenzy," there is no evidence that Sanders was in a rage or had an uncontrollable impulse *several hours later* when she took her own life. As a result,

4

the first exception to the general rule regarding liability for suicide does not apply in this case.[7]

Nevertheless, the majority likens the facts of this case to prior decisions involving the special relationship between a mental-healthcare provider and his patient in which we have held that whether the defendant's deficient medical care was the proximate cause of the patient's suicide was a jury question. But while this Court has previously held that the issue of proximate cause was a jury question in that particular context,[8] we have *never* extended this exception to apply to any other

---

[7] *See Tucker*, 332 Ga. App. at 191 (holding that an inmate's suicide was an unforeseeable intervening act for which a detention officer was not liable when, *inter alia*, there was no evidence that the inmate was in a rage or frenzy or had an uncontrollable impulse at the time when he took his own life, but was instead calm and controlled and appeared to have known what he was doing); *Harvey*, 260 Ga. App. at 194 (2) (holding that the exception to the general rule regarding proximate cause and suicide did not apply when there was no evidence that an inmate was in a rage or frenzy or and had an uncontrollable impulse at the time when he killed himself and when the inmate appeared calm, controlled, and appeared to know what he was doing); *Dry Storage Corp. v. Piscopo*, 249 Ga. App. 898, 900 (550 SE2d 419) (2001) (holding that a suicide victim did not kill himself during a rage or frenzy or in response to an uncontrollable impulse when, although his physical or psychological pain was obvious and he specifically attributed it to the alleged tortfeasor's negligence, he recorded a videotape just before he committed suicide in which he appeared to have control of himself and to have known exactly what he was doing).

[8] *See supra* footnote 6.

5

context in which the defendant has no ability to make decisions regarding the victim's mental healthcare, to supervise the victim, or to exercise control over the victim at the time of the suicide or negligent conduct. And I find no legal authority to support the majority's decision to do so now.[9]

---

[9] Although the special concurrence acknowledges the analytical framework applied in Georgia suicide cases for the past 50 years (*i.e.*, that suicide is generally an unforeseeable intervening cause of death unless either the rage-or-frenzy or special-relationship exception applies), it would nonetheless depart from that well-settled framework and apply "a straightforward application of the tort concept of foreseeability." In support of this position, the special concurrence relies on the Supreme Court of Georgia's decision in *Stevens v. Steadman*, 140 Ga. 680 (79 SE 564) (1913), which is not at all inconsistent with our current rule that, generally, suicide is an unforeseeable intervening cause of death in tort cases. Indeed, the *Stevens* Court ultimately held that the alleged tortfeasors could not be held liable for the plaintiff's husband's suicide, which allegedly resulted from their actions, regardless of how reprehensible those actions might be. *See Stevens*, 140 Ga. at 686-687. In addition to *Stevens*, the special concurrence relies on two federal cases, which, unlike the numerous Georgia cases cited in this dissent, are not binding precedents. The special concurrence then goes on to identify several Georgia cases, which it contends do not address the issue of suicide "through the framework of special relationships or whether the deceased acted in a rage or frenzy or due to an uncontrollable impulse." But all of the decisions relied upon by the special concurrence, holding (or arguably holding) that the suicides in question were not unforeseeable as a matter of law, involved a custodial or doctor-patient relationship between the deceased and the alleged tortfeasor. These cases, then, are perfectly consistent with our jurisprudence on civil liability for suicide (as outlined in this dissent). Indeed, even if not explicitly set forth in every opinion, the cases identified by the special concurrence have not departed from our general rule that suicide is not foreseeable as a matter of law, unless one of the aforementioned exceptions applies. To infer otherwise from cases where this Court has been less than precise in applying the well-established analytical framework for suicide cases seriously undermines the

To support its position that the second exception (*i.e.*, the "special-relationship exception") to the general rule precluding liability for suicide applies in this case, the majority relies primarily on *Purcell v. Breese*[10] and *Brandvain v. Ridgeview Inst., Inc.*,[11] both of which involve the special relationship between a suicidal patient and his treating physician or other healthcare provider. In those cases, this Court held that suicide-based tort claims against doctors or medical institutions—asserting that negligent medical care of a patient resulted in the patient's suicide—could be considered by a jury.[12] However, the defendants in those cases had specialized training in providing treatment to mentally-ill or suicidal patients, as well as the ability to make medical decisions or take actions regarding the patient's physical safety while the patient was in their custody or under their control. Suffice it to say, such circumstances are inapposite to the facts before us now.

Specifically, in *Purcell*, the evidence showed that, at the time when the defendant doctor discharged a patient (who later committed suicide) from a hospital,

doctrine of *stare decisis* as it applies to this particular line of jurisprudence.

[10] 250 Ga. App. 472 (552 SE2d 865) (2001).

[11] 188 Ga. App. 106 (372 SE2d 265) (1988).

[12] *See Purcell*, 250 Ga. App. at 475 (1); *Brandvain*, 188 Ga. App. at 116 (3) (b).

7

the patient was "at risk for committing suicide and had no intention of seeking outpatient treatment."[13] Under these particular circumstances, this Court held that the doctor's decision to discharge the suicidal patient "without talking with him, seeing him or reviewing the most recent entries in his record created a reasonable apprehension of harm sufficient to withstand summary judgment."[14] We further noted that, even though the doctor-patient relationship had been severed by the time of the suicide, the doctor could still be held liable because the alleged negligent acts occurred while the patient was *in the doctor's care* at the time of his discharge.[15]

And in *Brandvain*, a patient, while he was living in a rehabilitation facility, used a shirt to hang himself after he was caught the previous day in a bathroom with one arm of his sweater around his neck and the other caught in the upper corner of the door.[16] The patient's wife later sued his treating physician and the rehabilitation facility, asserting a wrongful-death claim, and the jury returned a verdict in her

---

[13] *Purcell*, 250 Ga. App. at 475 (1).

[14] *Id.*

[15] *See id*. at 475-76 (2).

[16] *See Brandvain*, 188 Ga. App. at 109-10.

8

favor.[17] In upholding the jury's verdict, this Court first noted that "[w]hile there is no duty to guarantee that a patient will not commit suicide, Georgia has long recognized a duty with regard to treatment of patients by doctors and other individual health care professionals as well as private hospitals . . . ."[18] And with regard to the doctor-patient relationship, this duty "extends to safeguarding and protecting the patient from any known or reasonably apprehended danger from himself which may be due to his mental incapacity, and to use ordinary and reasonable care to prevent it."[19] As to proximate cause, we explained that the act of suicide is not a "per se legally supervening/intervening act," but instead, "[i]f the intervening criminal act is a reasonably foreseeable consequence of the defendant's negligent conduct, the legal, causal connection between that conduct and injury is not broken."[20] Then, after setting forth the foregoing legal authority, we summarily concluded that, under the

---

[17] *See id.* at 111.

[18] *See id.* at 112 (2).

[19] *Id.* at 112-13 (2).

[20] *Id.* at 116 (3) (b) (punctuation omitted).

9

evidence in that particular case, the question of proximate cause was one for the jury.[21]

But here, unlike in the doctor-patient context, Sahlberg was not a mental-healthcare professional with specialized training in treating suicidal individuals, and more significantly, Sanders was not in his custody *or* under his supervision at the time when she committed suicide.[22] And while the majority finds these distinctions of no consequence, I respectfully disagree. Assuming that the special-relationship

---

[21] *See id.*

[22] *C.f. Bradley Ctr., Inc. v. Wessner*, 250 Ga. 199, 200-01 (1) (296 SE2d 693) (1982) (holding that defendant medical center, which allowed a patient, who "would likely cause bodily harm to his wife if he had the opportunity," to leave the center for a weekend could be liable for the patient's actions of killing his wife and her "paramour" during that weekend because, *inter alia*, when "the course of treatment of a mental patient involves an exercise of '*control*' over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that *control* with such reasonable care as to prevent harm to others at the hands of the patient" (emphasis supplied)); *Peterson*, 315 Ga. App. at 375-78 (3) (holding, in a medical-malpractice case in which the plaintiff sought to recover for injuries sustained in an attempted suicide, that whether the doctor's failure to provide the requisite standard of care in several respects, including his failure to involuntarily commit the plaintiff, was the proximate cause of her injuries could be decided by a jury); *but see Miranda v. Fulton DeKalb Hosp. Auth.*, 284 Ga. App. 203, 207-08 (2) (644 SE2d 164) (2007) (holding, in a medical-malpractice case, that defendant hospital and physicians' failure to sufficiently monitor a suicidal patient who slipped out of restraints, left the hospital, and committed suicide the next day was not the proximate cause of the patient's death as a matter of law).

10

exception applies to police officers and the citizens they serve, the only Georgia cases

addressing the potential liability of law-enforcement officers for suicide involve

inmates who committed suicide while they were physically in the alleged tortfeasor's

custody and under their supervision at the time of the suicide.[23] Moreover, even in

those cases when law-enforcement officers *do* have a suicidal inmate *in their custody*

and *under their control* at the time of the suicide, and as with Sahlberg, the officers

violated police-department protocol in some respect, we have still held that the

officers' conduct was not the proximate cause of the inmate's death as a matter of

law.[24] Finally, it is worth noting that, while Georgia courts have implicitly limited the

---

[23] *See infra* footnote 25. Notably, although the majority likens the doctor-patient relationship to the duty of care that a police officer owes to the general public, it does not discuss any of the "prison cases" that specifically address potential liability of police officers for suicide. Regardless, neither line of jurisprudence applies here because, unlike in both the hospital and prison contexts, Sanders was never in Sahlberg's custody or under his supervision or control.

[24] *See Tucker*, 332 Ga. App. at 190, 192-93 (holding that a detention officer's alleged negligent conduct of failing to medically screen an inmate, who later committed suicide in a holding cell—in violation of the police department's policies—was not the proximate cause of the inmate's death when there was no evidence that the inmate would have been unable to kill himself if he had been medically screened, and any claim that the inmate would have presented as suicidal in such screening was purely speculative); *Harvey*, 260 Ga. App. at 193-95 (2) (holding that two detention officers' failure to follow their police department's protocol to regularly monitor holding cells was not the proximate cause of the inmate's death when there was no evidence that the inmate would have been unable

11

special-relationship exception to *custodial* relationships in which the defendant has some ability to control the suicide victim's conduct, such as exists in hospitals and prisons, other jurisdictions have recognized this limitation more explicitly.[25]

In sum, I acknowledge that Sahlberg's flagrant violation of RHPD's policy regarding confidentiality was undoubtedly wrongful and it may indeed have been a factor in Sanders's tragic decision to take her own life. Nevertheless, even though questions of proximate cause ordinarily are reserved solely for the jury, Georgia

---

to take his life if surveillance protocol had been followed and any suggestion that the suicide attempt would have been unsuccessful if it had been followed was pure speculation).

[25] *See Mikell v. Sch. Admin. Unit No. 33*, 158 N.H. 723, 728 (I) (972 A2d 1050) (2009) (noting, as to the special-relationship exception, that a duty of care to prevent suicide has been imposed on "(1) institutions such as jails, hospitals and reform schools, having actual physical custody of and control over persons; and (2) persons or institutions such as mental hospitals, psychiatrists and other mental-health trained professionals, deemed to have a special training and expertise enabling them to detect mental illness and/or the potential for suicide, and which have the power or control necessary to prevent that suicide" (punctuation omitted)); *Gilmore v. Shell Oil Co.*, 613 So2d 1272, 1276 (Ala. 1993) (noting that the "duty to prevent" exception to the general rule that suicide exonerates a defendant from legal responsibility applies only in a "*custodial* situation . . . typically in the case of hospitals or prisons" (punctuation omitted)); *Krieg v. Massey*, 239 Mont. 469, 473 (781 P2d 277) (1989) (same); *see also Aguila v. Hilton, Inc.*, 878 So2d 392, 399 (Fla. Dist. Ct. App. 2004) ("[I]implicit in the special[-]relationship exception is the proposition that the special relationship must include the right or the ability to control another's conduct." (emphasis and punctuation omitted)).

courts have repeatedly held that, as a general matter of law, "*suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability*."[26] And because no established exception to this general rule applies in this case, I would reverse the trial court's denial of Sahlberg and the City's motion for summary judgment on Maia's wrongful-death and survival claims.

I am authorized to state that Judge Ray and Judge Peterson join in this dissent.

---

[26] *Tucker*, 332 Ga. App. at 191 (punctuation omitted); *accord La Quinta Inns, Inc.*, 289 Ga. App. at 816 (1); *Harvey*, 260 Ga. App. at 193 (2); *Dry Storage Corp.*, 249 Ga. App. at 899.

13

A15A2334.  MAYOR AND CITY COUNCIL OF THE CITY OF

RICHMOND HILL et al. v. MAIA et al.

PETERSON, Judge, dissents in part.

I concur in the majority opinion as to Divisions 1, 3, 4, and 5.  I join Judge Dillard's dissent as to Division 2 and I agree with all that is said in that dissent that is necessary to its holding.[1]  I write separately to make clear that I join the dissent not because I necessarily believe that the rule outlined in that opinion is the best rule --

---

[1] That said, I disagree with the inclusion in that dissent of footnote 26 and its associated text regarding decisions of the courts of our sister states, because it is irrelevant to the dissent's holding. Judge Dillard's dissent demonstrates conclusively that Georgia caselaw does not extend the special-relationship exception to noncustodial relationships between law enforcement officers and the general public. A consideration of foreign law would be relevant here only if we were trying to determine what the rule should be.  But as Judge Dillard has made clear, previous decisions of our court and our Supreme Court have already said what the rule is. Given that, it is unnecessary and irrelevant to consider what answers to that question the courts of our sister states may have provided in the context of their own laws. *See Satilla Health Servs., Inc. v. Bell*, 280 Ga. App. 123, 131 n.4 (633 SE2d 575) (2006) (declining to consider arguments regarding foreign law because Georgia law was clear).

that question is not presented here and I express no view on it -- but because it is the rule that the precedents of our Court and our Supreme Court bind us to apply.

The special concurrence refuses to follow that binding precedent, and points to a number of our decisions in which we did not explicitly acknowledge or apply the general rule that suicide is an unforeseeable intervening cause of death. But in none of those decisions did we reject the general rule, either. And, more importantly, none of those decisions are decisions of our whole court overruling *Appling v. Jones* and its progeny.

Precedent does not cease to be binding simply because we can find subsequent cases that, for whatever reason, do not apply that precedent. Precedent does not cease to be binding even when we find subsequent decisions of less than the whole court explicitly refusing to follow it. *See Dority v. State*, 335 Ga. App. 83, 99 n.8 (4) (c) (780 SE2d 129) (2015) (statement in subsequent decision of less than whole court that prior case is of no precedential utility did not overrule prior case).

When we wish to reject prior precedent, as the special concurrence proposes, we should say so and employ the appropriate process. When the decisions we wish to change are our own, that process would be consideration by the whole Court. In

2

this case, however, the Supreme Court's precedent precludes any effort by this Court to change the rule.

In *Stevens v. Steadman*, the plaintiff alleged that the defendants, in pursuance of a conspiracy to cause the death of the plaintiff's husband and thereby benefit financially, wrote a letter to the husband blackmailing him into quitting his job lest they publicly reveal unspecified and mysterious matters that would cause him and his family great harm. 140 Ga. 680, 681-84 (79 SE 564) (1913).[2] The plaintiff alleged further that the defendants knew of the husband's impaired mental and physical state, and knew and intended that the letter would cause him to commit suicide, which he in fact did. *Id*. Our Supreme Court held that the defendants could not be liable, because without direct statements in the letter specifically urging the husband to kill himself, his suicide was not the "legal and natural result" of the defendants' actions.

---

[2] I agree with the special concurrence that the initial foundations of our present rule may have arisen in part from a now-outdated understanding of mental health. Our Supreme Court was explicit in *Stevens* that its decision was based on its understanding of mental health. 140 Ga. at 687 (holding that, "in the present state of our knowledge concerning the laws governing the operation of the mind," suicide was not the legal and natural result of concerted efforts of a conspiracy allegedly designed to cause the decedent to kill himself). Obviously, our understanding of "the laws governing the operation of the mind" has improved dramatically in the 103 years since 1913. But because that outdated understanding was the Supreme Court's, we would lack the authority to correct it even if we wanted to.

*Id*. at 686-87; *cf*. OCGA § 51-12-9 (damages are too remote to be recovered when they are "traceable to the act, but ... are not its legal and natural consequence"). *Stevens* has not subsequently been overruled by the Supreme Court or abrogated by statute, and remains binding on us. I see no way that we can conclude the wrongful death claim here can proceed if the claim in *Stevens* could not.

I am authorized to state that Judge Ray joins me in this dissent.